# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

COVYE COUSINS,

                Plaintiff,

    v.

DAVID HATHAWAY, *et al.*,

                Defendants.

Civil Action No. 12-cv-1058 (RLW)

## MEMORANDUM OPINION

Plaintiff Covey Cousins ("Plaintiff") boarded a bus, allegedly failed to pay his fare, and was arrested by Officers David Hathaway and Davonne Williams. Officer Hathaway utilized pepper spray in arresting him, so Plaintiff was taken to a hospital for treatment. Claiming that they were having difficulty restraining Plaintiff at the hospital, Officer Hathaway pepper-sprayed Plaintiff again. Following this incident, the officers brought several criminal charges against Plaintiff.

Plaintiff later filed this lawsuit against Defendants Metro Transit Police Department (MTPD), the Washington Metropolitan Area Transit Authority (WMATA), and Officers Hathaway and Williams asserting common law claims of assault (Count I), battery (Count II), false arrest (Count III), defamation (Count IV), negligent hiring/supervision (Count V), and malicious prosecution (Count VI). Compl. ¶¶ 16–43.

Presently before the Court are Defendants Hathaway and Williams' ("Defendants") Motion for Summary Judgment, Defs.' Mot. Summ. J. (Dkt. No. 19), and Defendants' Motion *in Limine*, which requests that this Court exclude findings of facts from a related proceeding in D.C. Superior Court, Defs.' Mot. *in Limine* (Dkt. No. 25). Upon review of the parties'

submissions, the relevant legal authorities, and the record, the Court **grants in part and denies in part** Defendants' motion for summary judgment. The Court also **denies without prejudice** Defendants' Motion *in Limine*.

## I.    BACKGROUND

On January 15, 2011, at approximately 12:30 a.m., Plaintiff boarded a WMATA bus. Defendants' Statement of Material Facts Not in Dispute ("Defs.' Facts") ¶ 1; Plaintiff's Statement of Material Facts Not in Dispute ("Pl.'s Facts") ¶ 1. The parties dispute much of what occurred after Plaintiff boarded the bus. The Court will first summarize Plaintiff's account of the incident, followed by Defendants' account of the incident.[1]

According to Plaintiff, a male bus operator was at the helm when he initially boarded the bus, paid his fare, and then fell asleep. Dep. of Covey Cousins ("Cousins Dep.") 24:4–15, Ex. 7 to Pl.'s Opp'n to Defs.' Mot. Summ. J. ("Pl.'s Opp'n"). He was awakened by a female bus operator, Adrienne Howard, telling him that he had not paid his fare. Pl.'s Facts ¶ 3. He offered his SmarTrip card as proof of payment, but Ms. Howard refused his offer. *Id.* ¶ 4. Ms. Howard then flagged down the nearest officers, Defendants Hathaway and Williams. Cousins Dep. 25:8–12. Officer Hathaway boarded the bus and approached Plaintiff, without first speaking to Ms. Howard. Pl.'s Facts ¶ 6. Officer Hathaway asked him if had paid his fare, Plaintiff replied "yes," and handed Officer Hathaway his SmarTrip card. Cousins Dep. 60:16–17, 72:4–19. Officer Hathaway then asked him to exit the bus, and Plaintiff walked, voluntarily, to the front of the bus, as Officer Hathaway trailed behind him. Cousins Dep. 61:9–20. When Plaintiff was at the door steps of the front of the bus and faced the exit, Officer Hathaway either kicked or kneed him off the bus, causing Plaintiff to land on his stomach and hands. Cousins Dep. 60:21–22,

---

[1] The Court summarizes both accounts of the incident only to highlight the glaring differences between them. In its analysis, the Court will resolve all ambiguities and draw all factual inferences in favor of Plaintiff. *Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009).

61:19–21, 70:5–8. While Plaintiff was still on the ground, Officer Hathaway kneed him on his head. Cousins Dep. 61:1–2, 70:11–12. Officer Hathaway proceeded to handcuff Plaintiff, and pepper-sprayed him in the process without warning him beforehand. Cousins Dep. 73:11–12, 76:4–22, 77:1. The officers then transported Plaintiff to a hospital in their patrol car. Cousins Dep. 81:17–22. At the hospital, Plaintiff was placed in a gurney and restrained by the gurney's accompanying orange straps. Dep. of Davonne Williams ("Williams Dep.") 9:13–18, Ex. 4 to Pl.'s Opp'n. In addition to being restrained by the gurney's straps, the officers also put a second set of handcuffs on Plaintiff, this time handcuffing him to the gurney. Dep. of David Hathaway ("Hathaway Dep.") 30:7–11, Ex. 2 to Pl.'s Opp'n. Plaintiff was pepper-sprayed a second time at the hospital, Williams Dep. 35:19–21, attached to Defs.' Mot. Summ. J (Dkt. No. 19-3), the effects of which caused the hospital staff to clear out an area by the front entrance of the ER because the pepper spray was affecting other patrons. Dep. of Daniel Gerdy ("Gerdy Dep.") 31:5–18, Ex. 5 to Pl.'s Opp'n.

Officers Hathaway and Williams (and Ms. Howard) offer a different picture of the events. According to Ms. Howard, Plaintiff was disrespectful towards her when she told him that he needed to pay his fare, including telling her, "[b]itch, just drive the bus." Dep. of Adrienne Howard ("Howard Dep.") 16:23–24, attached to Defs.' Mot. Summ. J (Dkt. No. 19-3). She then flagged down Officers Hathaway and Williams. Defs.' Mot. Summ. J at 3; Cousins Dep. 52:6–8. Upon entering the bus, Officer Hathaway asked Plaintiff "multiple times to get off the bus." Williams Dep. 22:2–7. When Plaintiff refused, each officer grabbed one of Plaintiff's arms and escorted him off the back of the bus. Williams Dep. 22:11–13. Officer Hathaway claimed that, after existing the bus, Plaintiff "remained agitated," "verbally abusive," and "noncompliant to any of [his] verbal commands." Hathaway Dep. 36:10–12. He also asked

Plaintiff if he could see his SmarTrip card, but Plaintiff ignored him. Hathaway Dep. 36:13–15. Then, after Plaintiff refused Officer Hathaway's repeated requests to stop moving around and to take his hands out his pockets, he told Plaintiff that he was "under arrest" and ordered Plaintiff to "give me your hands," but he remained noncompliant. Hathaway Dep. 36:18–20. "At that point," Officer Hathaway performed an "arm bar/leg sweep," taking Plaintiff to the ground, but Officer Hathaway was still unable to restrain Plaintiff's hands. Hathaway Dep. 36:21–23. After performing other countermeasures, including "some knee strikes," he was able to restrain one of Plaintiff's hands. Hathaway Dep. 36:24–25. Fearing for his safety because he had not yet conducted a pat-down of Plaintiff, he told Plaintiff that "[i]f you don't give me your hands, I'm going to . . . OC[2] spray you." Hathaway Dep. 36:1–5. Plaintiff continued to resist, so Officer Hathaway sprayed him. Hathaway Dep. 36:5–6. Plaintiff relented, permitting Officer Hathaway to place him under arrest. Hathaway Dep. 36:6–7.

The officers then radioed for emergency medical services (EMS) personnel to examine Plaintiff and take him to the hospital because he complained of eye irritation. Hathaway Dep. 37:7–9; D.C. Fire & EMS Incident Report, Ex. B to Defs.' Mot. Summ. J. Officer Hathaway explained that at the hospital, Plaintiff was handcuffed to his gurney because he "began shaking the gurney violently," and at "one point, [he] thought [Plaintiff] could possibly shake himself off the gurney or tip the gurney." Hathaway Dep. 30:12–14. Officer Hathaway also stated that Plaintiff was kicking Officer Williams. Hathaway Dep. 30:15–16. The officers accompanied Plaintiff to his hospital room, where he awaited treatment. Williams Dep. 34:3–10. The doctor entered the room and attempted to talk to Plaintiff and Officer Williams, but Plaintiff kept "flailing his feet," "tr[ied] to scoot off the gurney," "cuss[ed] [the doctor] out," and "tried to kick" Officer Williams in the face. Williams Dep. 34:13–24. After Plaintiff was pepper-sprayed

_____

[2] Oleoresin Capsicum (OC) spray is informally referred to as pepper spray.

a second time, he "immediately stopped cursing, he stopped talking, and he just . . . laid there on the gurney." Williams Dep. 35:22–25.

After Plaintiff received treatment, Officer Hathaway took him back to the precinct to complete the required paperwork. Williams Dep. 37:17–22. Later that same day, Plaintiff was charged with: (1) Unlawful entry onto property, D.C. Code § 22-1341; (2) Threats to do bodily harm, *id.* § 22-407; (3) Assaulting, resisting or interfering with a police officer, *id.* § 22-405(b); and (4) Disorderly conduct, *id.* § 22-1321. Ex. J to Defs.' Reply (Dkt. No. 24-1). The criminal charges led to revocation of Plaintiff's parole, resulting in him being incarcerated "for over 10 months." Pl.'s Opp'n at 2. Ultimately, the District of Columbia decided not to prosecute the disorderly conduct and unlawful entry charges on June 13 and June 17, 2011, respectively, and the remaining threat and assault charges resulted in a trial and his acquittal. *Id.*

Plaintiff, in turn, filed the instant suit against MTPD, WMATA, and Officers David Hathaway and Davonne Williams, asserting common law claims for assault, battery, false arrest, defamation, negligent hiring/supervision, and malicious prosecution. Compl. ¶¶ 16–43. After Defendants moved to dismiss Plaintiff's claims, but before a hearing on the motion to dismiss, the parties filed a status report informing the Court of their agreement to dismiss with prejudice Defendants MTPD and WMATA, and also to dismiss with prejudice the negligent hiring/supervision claim. *See* Dkt. No. 6. Thereafter, the Court issued an Order consistent with the parties' representations, and vacated the hearing on the motion to dismiss. *See* Dkt. No. 7. The Court now addresses the remaining common law claims of assault, battery, false arrest, malicious prosecution and defamation against Officers Hathaway and Williams.

## II. STANDARD OF REVIEW

"Summary judgment may be granted only where there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *Moore*, 571 F.3d

at 66 (citing FED. R. CIV. P. 56(c) and *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986)). "A genuine issue of fact derives from the evidence being such that a reasonable jury could return a verdict for the nonmoving party . . . resolving all ambiguities and drawing all factual inferences in favor of the nonmoving party." *Id.* (citing *Anderson*, 477 U.S. at 248) (internal quotation marks and citations omitted). "If material facts are at issue, or, though undisputed, are susceptible to divergent inferences, summary judgment is not available." *Id.* (quoting *Kuo-Yun Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994)).

## III. DISCUSSION

### A. Assault & Battery

In the District of Columbia, an assault is "an intentional and unlawful attempt or threat, either by words or by acts, to do physical harm to the victim." *Fenwick v. United States*, 926 F. Supp. 2d 201, 218 (D.D.C. 2013) (quoting *Etheredge v. District of Columbia,* 635 A.2d 908, 916 (D.C. 1993)). "A battery is an intentional act that causes a harmful or offensive bodily contact." *Id.* (quoting *Etheredge,* 635 A.2d at 916). But not every battery or assault is unlawful. "It is well established that a police officer has a qualified privilege to use reasonable force to effect an arrest, provided that the means employed are not 'in excess of those which the actor reasonably believes to be necessary.' " *Id.* at 219 (quoting *Kotsch v. District of Columbia,* 924 A.2d 1040, 1047 (D.C. 2007)). The court in *District of Columbia v. Chinn*, 839 A.2d 701, 706–07 (D.C. 2003), explained:

> Strictly speaking, a police officer effecting an arrest commits a battery. If the officer does not use force beyond that which the officer reasonably believes is necessary, given the conditions apparent to the officer at the time of the arrest, he is clothed with privilege. . . . [W]here the excessive force is the product of a battery, an unwanted touching inherent in any arrest, which escalates in an unbroken manner into excessive force, the cause of action is a battery … *with the privilege having ended at the point where excessive force began*.

*Id.* (emphasis added).

Although the legal principles governing whether an officer has committed an assault or battery are clear, the parties' evidentiary obligations governing the same are an unsettled issue under D.C. law. Specifically, there are two issues that the D.C. Court of Appeals has expressly declined to address: (1) which party bears the burden of proof as to the reasonableness of an officer's force and hence whether the officer's use of force was privileged; and (2) whether the plaintiff must introduce expert testimony regarding whether the officer used reasonable force. *Smith v. District of Columbia*, 882 A.2d 778, 791 (D.C. 2005); *District of Columbia v. Jackson*, 810 A.2d 388, 395 n.15 (D.C. 2000).[3] The instant dispute does not require the Court to delve into those unsettled areas, however.

As to the first issue, the Court concludes, for the reasons discussed below, that it would reach the same conclusion regardless of whether it initially places the burden on Plaintiff or the officers. That is, even assuming Plaintiff has the burden, he has presented a "legally sufficient evidentiary basis for a reasonable jury to have found for him with respect to his battery [and assault] claim[s]." *Smith*, 882 A.2d at 792 (internal quotation marks omitted).[4]

With respect to the second issue, which Defendants raise in seeking summary judgment, the Court concludes, for the reasons discussed below, that the facts at issue here do not require the presentation of expert testimony by either party.

---

[3] Without resolving the issue, the D.C. Court of Appeals has provided some guidance on whether the plaintiff must present expert testimony issue. It suggested that if the officer asserts as a defense that he or she did not use excessive force and has presented expert testimony in support of this defense, then the plaintiff may also need to present expert testimony in response. *See Smith*, 882 A.2d at 791 (stating that "this is a subtle issue, the answer to which might depend, for example, on whether in asserting the lack of excessive force as a *defense* to assault and battery . . . the defendant itself has come forward with admissible testimony on the point") (emphasis in original) (internal quotation marks omitted).

[4] The Court is aware that another court in this District dealt with this uncertainty by saddling the District of Columbia with the burden of proof, and granting summary judgment only if it met its burden. *Buruca v. District of Columbia*, 902 F. Supp. 2d 75, 81 (D.D.C. 2012). As explained, the Court need not reach the question in this case.

Having addressed those unsettled issues, the Court turns first to whether there is a genuine issue of material fact that Officer Hathaway committed an unlawful assault or battery.

### i. Officer Hathaway

Officer Hathaway does not dispute that his conduct towards Plaintiff, including pepper spraying him twice, constitutes an assault and battery. Rather, he contends that he did not use excessive force. *See* Defs.' Mot. Summ. J. at 5. In particular, Defendants point to the line of cases from the D.C. Court of Appeals explaining when a plaintiff is required to present testimony in negligence cases regarding the standard for the duty of care. *District of Columbia v. Arnold & Porter*, 756 A.2d 427, 433 (D.C. 2000) ("[P]laintiff must put on expert testimony to establish what the standard of care is if the subject in question is so distinctly related to some science, profession or occupation as to be beyond the ken of the average layperson.") (internal quotation marks moitted). Defendants argue that they are entitled to summary judgment on the assault and battery claim because Plaintiff failed to produce expert testimony in support of his assertion that the use of pepper spray was excessive force. Defs.' Mot. Summ. J. at 5 ("Plaintiff has not identified any witness who will testify that Defendant Hathaway's use of O.C. was unreasonable, a violation of accepted police procedures or clearly excessive under these circumstances."). Also, as further evidence that his use of pepper spray was reasonable, Officer Hathaway relies on WMATA General Order #130, Ex. H. to Defs.' Mot. Summ. J., and contends that "O.C. is a recognized and authorized agent issued to police officers for use in restraining arrestees." Defs.' Mot. Summ. J. at 5. The Court finds these arguments unpersuasive.

Expert testimony is not required in all cases. As the D.C. Court of Appeals has recognized, "no expert testimony is needed if the subject matter is within the realm of common knowledge and everyday experience[.]" *Briggs*, 481 F.3d at 845 (quoting *Hill*, 779 A.2d at

908).[5]  Under the circumstances present here, and drawing all inferences in favor of Plaintiff, the question whether Officer Hathaway's use of pepper spray was excessive falls into this realm. Plaintiff's evidence supports his claim that he was not resisting arrest when Officer Hathaway initially pepper-sprayed him outside the bus, *see supra* Section I.; and that he was fully restrained when Officer Hathaway pepper-sprayed him a second time, while he was strapped to the gurney, his hands were in cuffs, and he was also handcuffed *to* the gurney, *see id*.  An expert is not necessary to illuminate the obvious: the use of pepper spray—or *any* force, for that matter—is not necessary to arrest and restrain an individual that is not resisting arrest, or that has already been restrained.  *Cf. Bostic v. Henkels & McCoy, Inc.*, 748 A.2d 421, 425-26 (D.C. 2000) ("[E]xpert testimony was not needed to permit a jury fairly to decide that leaving such a gap between boards covering a trench on which pedestrians were expected to walk was negligence, particularly in the absence of safety cones and signs or other warnings of a hazardous condition."); *Trust v. Washington Sheraton Corp.*, 252 A.2d 21, 22 (D.C. 1969) (expert testimony not required on whether a slightly raised bathroom step was dangerous).  Relying on common sense alone, any jury could plausibly conclude that Officer Hathaway's use of pepper spray was unreasonable and excessive.  The Court concludes, therefore, that it was not necessary for Plaintiff to produce expert testimony to support his claim that both uses of pepper spray were excessive force.

---

[5] The Court notes that it is appropriate to look to the D.C. Court of Appeals' jurisprudence on the standard of care in negligence cases, which Defendants have relied upon, to determine whether Plaintiff is required to present expert testimony on the reasonableness of an officer's force in assault and battery cases.  The Court does not see any reason why the relevant inquiry in determining whether a plaintiff must present expert testimony should differ depending on whether the case involves an unintentional tort (negligence) or intentional torts (assault and battery).  The Court believes that the D.C. Court of Appeals would reach the same conclusion.  *See Earle v. District of Columbia*, 707 F.3d 299, 310 (D.C. Cir. 2012) ("Because no D.C. Court of Appeals case is directly on point, we 'reason by analogy from D.C. cases' to predict how that court would decide the question in a case like this." (quoting *Workman v. United Methodist Comm. on Relief,* 320 F.3d 259, 262 (D.C. Cir. 2003))).

Nor does Officer Hathaway's reliance on WMATA General Order #130 ("Use of Force Order" or "the Order") alter this conclusion. He misinterprets this Order. The "Use of Force" Order—as it is styled in the document subject line—is, not surprisingly, a general directive on the amount of force an officer may use. Use of Force Order at 1. The Use of Force Order begins by stating that its "purpose" is to "establish[] the parameters of force available to members and provides a review procedure for use of force incidents." *Id.* The Order then states that the "policy" is that "[m]embers will use the amount of force necessary to effect an arrest, overcome resistance, or protect themselves and/or others from harm. Use of force must be justified. Unnecessary force is prohibited." *Id.* So far, the Order has said nothing about pepper spray. Only later, when describing the category of "Less-Lethal Force Instruments," does the Order discuss pepper spray. In so doing, it states that "OC is an alternative to hands-on countermeasures," but it cautions that it "may be used when less severe options would be *clearly ineffective*." *Id.* (emphasis added). Thus, contrary to Officer Hathaway's suggestion, the Use of Force Order is not an unconditional endorsement of the use of pepper spray; it simply stands for the unremarkable proposition that officers may use only reasonable force to effect an arrest, and under certain circumstances, the use of pepper spray *may* be reasonable (e.g., when less severe options would be clearly ineffective). Under the facts as presented by Plaintiff, a jury could certainly find that such circumstances were not present here, during either use of the pepper spray.

But even assuming the Court was inclined to reach the conclusion that a jury could not find that *either* use of pepper spray was excessive, Officer Hathaway still is not entitled to summary judgment on the assault and battery claim because his use of pepper spray was not Plaintiff's only allegation of force. Plaintiff also asserted that Officer Hathaway kicked or kneed

10

him even though he was not resisting arrest.  *See supra* Section I.; Pl.'s Facts ¶ 16.  A jury could also conclude that this was excessive force.  Plaintiff is thus entitled to have a jury hear his assault and battery claim against Officer Hathaway on this basis alone.

### ii. Officer Williams

Plaintiff asserts that "[b]oth Defendants' [sic] used excessive force while removing Plaintiff from the bus pushing him to the ground, kneeing him in his back and head, using pepper spray twice including while he was handcuffed and strapped to a gurney around the waist and legs."  Pl.'s Opp'n at 8–9 (Dkt. No. 20).  However, the record supports only Plaintiff's assertion that Officer Williams grabbed his arm during the arrest.  Pl.'s Facts ¶ 12; Williams Dep. 22:2–7 ("After Officer Hathaway asked him multiple times to get off the bus, that's when he grabbed his arm to escort him off the bus.  *I grabbed the other arm to escort him off the bus . . . .*") (emphasis added).  Plaintiff fails to cite any portion of the record in support of his assertion that Officer Williams pushed him to the ground, kneed him on his back and head, and used pepper spray against him.

On this record, no reasonable jury could conclude that Officer William's grabbing of Plaintiff's arm to escort him of the bus was excessive force.  Plaintiff does not dispute that he had been told to leave the bus by both the bus driver and Officer Hathaway and that he refused to do so.  Grabbing his arm, then, was reasonable force under the circumstances and thus privileged.

### B.  False Arrest

"In the District of Columbia, false arrest 'is defined as the unlawful detention of a person without a warrant or for any length of time whereby he is deprived of his personal liberty or freedom of locomotion; it may be caused by actual force, or by fear of force, or even by

words.' " *Hunter v. District of Columbia*, 824 F. Supp. 2d 125, 137 (D.D.C. 2011) (quoting

*Tocker v. Great Atl. & Pac. Tea Co.,* 190 A.2d 822, 824 (D.C. 1963)).  Probable cause to arrest

is a defense to false arrest.  *DeWitt v. District of Columbia*, 43 A.3d 291, 295 (D.C. 2012).  "For

probable cause to exist, 'it is sufficient that the arresting officer have a good faith, reasonable

belief in the validity of the arrest and detention.' "  *Id.* (quoting *Gabrou v. May Dep't Stores Co.,*

462 A.2d 1102, 1104 (D.C. 1983)).  Furthermore, when "defending against a claim of false

arrest," an officer can prevail if he or she "can show that probable cause existed to arrest for any

offense, even if it differs from the offense for which the arrest was actually made."  *Bradshaw v.*

*District of Columbia*, 43 A.3d 318, 324 (D.C. 2012) (internal quotations omitted).

     " 'The existence of probable cause is a mixed question of law and fact.' "  *Pitt v. District*

*of Columbia*, 491 F.3d 494, 502 (D.C. Cir. 2007) (quoting *Smith v. Tucker,* 304 A.2d 303, 306

(D.C. 1973)).  "The existence of the facts [is] for the jury, but their effect when found is a

question for the determination of the court."  *Id.* (quoting *Smith v. Tucker,* 304 A.2d 303, 306

(D.C. 1973)).

     Defendants contend that their arrest of Plaintiff was justified because they had probable

cause to arrest him for unlawful entry onto property and for disorderly conduct.  Defs.' Mot.

Summ. J. at 4.  The Court concludes that the officers had probable cause to arrest Plaintiff for

unlawful entry onto property, and therefore the officers are entitled to summary judgment on the

false arrest claim.[6]

---

[6] This makes it unnecessary to determine whether the officers also had probable cause to arrest Plaintiff for
disorderly conduct.  *Bradshaw*, 43 A.3d at 324 (stating that officers can prevail if they show that "probable cause
existed to arrest for *any* offense, even if it differs from the offense for which the arrest was actually made")
(emphasis added) (internal quotation marks omitted).  For this reason, the Court also rejects Plaintiff's argument that
the officers should have charged him with unlawful entry of a motor vehicle, D.C. Code § 22-1341, instead of
unlawful entry onto "property." D.C. Code § 22-3302.  *See* Pl.'s Mot. at 5–6.

It is undisputed, as evidenced by Plaintiff's own deposition, that: Ms. Howard, the bus operator, believed that Plaintiff did not pay his fare; she asked him to get off the bus; he refused to do so; and thereafter she flagged down Officers Hathaway and Williams. Cousins Dep. 50:15–21, 51:7–21, 58:1–4; *see also* Howard Dep. 16: 18–24, 17:7–14 (stating that she asked Plaintiff twice to pay his fare). Plaintiff also stated twice in his deposition that he saw Officer Hathaway speak to Ms. Howard upon boarding the bus. Cousins Dep. 59:18–20, 60:10–12. Thus, relying on the representations of Ms. Howard—which the officers had no basis to believe was unreliable—the officers had probable cause to arrest Plaintiff for unlawful entry. *See, e.g.*, *Saidi v. Washington Metro. Area Transit Auth.*, 928 F. Supp. 21, 26–27 (D.D.C. 1996) (finding that the officers had probable cause to arrest because, "[u]pon arriv[ing] at the scene, [they] interviewed the bus driver" and other witnesses, and were informed that the plaintiff had spat on the bus driver, so they arrested her based on that information).

Despite his deposition testimony that corroborates the above facts, Plaintiff claims that Officer Hathaway did not speak to Ms. Howard upon entering the bus. Pl.'s Facts ¶ 6. In support of his assertion, he points to Officer Hathaway's testimony from a related proceeding. *See id.* (citing this testimony). Officer Hathaway's testimony did include a statement suggesting that he did not speak *directly* with Ms. Howard. *See* Hearing Tr. at p.31, *United States v. Cousins*, No. CMD-892-11 (D.C. Sup. Ct. July 21, 2011) ("Hearing Tr.") (Ex. 3 to Pl.'s Opp'n) ("I never had a one on one conversation with the bus driver."). Plaintiff ignores, however, Officer Hathaway's statement during that same line of questions that he "*overheard . . . [Plaintiff's and the bus operator's] argument.*" *Id.* (emphasis added). Overhearing their

argument would have informed Officer Hathaway that Ms. Howard believed Plaintiff had not paid his fare, thus providing probable cause to arrest.[7]

More significantly, it is undisputed that *Officer Williams* spoke with Ms. Howard before they arrested him. Hearing Tr. at p.79 (Ex. I to Defs.' Reply) (stating that she and Officer Hathaway "ran over [to the bus] to see what the issue was," the bus operator told them that "someone didn't pay their fare and that she wanted them off the bus because she didn't feel safe," so they "got on the bus to talk to the defendant and ask him if he paid his fare"). Officer Williams's conversation with Ms. Howard of course provided probable cause to arrest Plaintiff.[8] Thus, even if the Court were to draw the inference that Officer Hathaway did not speak with Ms. Howard before the officers arrested Plaintiff—which Plaintiff's deposition testimony directly contradicts[9]—Plaintiff has not created any genuine issue as to whether Officer Williams spoke to Ms. Howard.

Plaintiff rejoins that the officers could have verified, before they arrested him, whether he had paid his fare by taking his SmarTrip card to a SmarTrip reader. Pl.'s Opp'n at 5 ("The Defendants' [sic] had the ability to confirm payment the night of the arrest and at the scene of the arrest but neglected to check."). Plaintiff raises this point presumably to argue that the officers

---

[7] The Court also notes that, in the same line of questions, there was another statement by Officer Hathaway that suggests that he did in fact speak with Ms. Howard after speaking with Plaintiff. *Id.* (answering "correct" to the question "*before you engaged the bus driver about what happened*, you just immediately went to Mr. Cousins to ask him what happened, is that correct?").

[8] Plaintiff also argues, in a single sentence, that his arrest was unlawful because the officers arrested him "for a misdemeanor they have not *witnessed*." Pl.'s Opp'n at 3 (emphasis added) (citing D.C. Code § 23-581). The Court is not inclined to address Plaintiff's cursory, one-sentence argument. *See, e.g.*, *United States v. Hughes*, 514 F.3d 15, 18 (D.C. Cir. 2008).

[9] The Court also notes that a party cannot create a genuine issue of a material fact by contradicting its prior testimony. *Pyramid Sec. Ltd. v. IB Resolution, Inc.*, 924 F.2d 1114, 1123 (D.C. Cir. 1991) ("Courts have long held that a party may not create a material issue of fact simply by contradicting its prior sworn testimony."). Our Court of Appeals has explained "that the prior sworn statement will receive controlling weight unless the shifting party can offer persuasive reasons for believing the supposed correction." *Id.* Although here Plaintiff is using another party's testimony—as opposed to using his own subsequent testimony—to contradict his own prior testimony, there is not any reason why this rule should not apply with equal force under the circumstances. And Plaintiff has not offered any reason why the Court should disregard his own deposition testimony.

failure to do so was unreasonable and thus negated their claim of probable cause.  The Court

rejects this argument.  Courts have repeatedly held that once an officer reasonably believes there

is probable cause to arrest, the officer is generally not required to investigate claims of

innocence.  *See, e.g.*, *Amobi v. District of Columbia Dep't of Corr.*, 2014 WL 2895933, at *5

(D.C. Cir. June 27, 2014) (collecting cases).

There are also significant, practical considerations that weigh heavily in favor of adhering

to this rule here.  Contrary to Plaintiff's unsupported assertion, the metrobus at issue here was

not equipped with a SmarTrip reader, so the officers could not check Plaintiff's card on the bus.

Williams Dep. 24:19–24.[10]  The record indicates that the closest SmarTrip reader was located at

nearby L'Enfant Plaza metro station, Williams Dep. 24:19–25, 25:1, although it is unclear

exactly how far the SmarTrip reader was from the scene of the incident.  But even if the

SmarTrip reader was close by, requiring the officers to investigate Plaintiff's claim and thus

detain the metrobus would have caused a significant burden on the officers' ability to respond

promptly to this situation; and it would have also caused considerable inconvenience to

individuals relying on the metrobus for transportation (both those individuals who were already

passengers on the metrobus and other individuals waiting at bus stops along the route who are

hoping the bus arrives (fairly) close to the expected arrival time to pick them up).  If the bus

itself had been equipped with a SmarTrip reader, Plaintiff's argument would be more

compelling.  But that was not the case here.

In conclusion, because there is not any basis to deviate from the general principle that

officers are not required to investigate claims of innocence before making an arrest, Defendants

are entitled to summary judgment on Plaintiff's false arrest claim.

---

[10] Plaintiff relies on Officer Williams' deposition in support of his argument on this point, Pl.'s Facts ¶ 10, but the portion of the deposition that he cites says the opposite.  Williams Dep. 24:24 ("No, you can't check [a SmarTrip card] on [that] bus.").

**C. Malicious Prosecution**

" '[T]o establish a case of malicious prosecution[,] there must be (a) a criminal proceeding instituted or continued by the defendant against the plaintiff, (b) termination of the proceeding in favor of the accused, (c) absence of probable cause for the proceeding, and (d) 'Malice,' or a primary purpose in instituting the proceeding other than that of bringing an offender to justice.' " *DeWitt*, 43 A.3d at 296 (quoting *Jarett v. Walker,* 201 A.2d 523, 526 (D.C.1964)) (citation and internal quotation marks omitted); *Amobi*, 2014 WL 2895933, *7. Further, under District of Columbia law, "[t]he determination of malice on the part of defendant is exclusively for the factfinder." *Tyler v. Central Charge Serv., Inc.*, 444 A.2d 965, 969 (D.C. 1982) (*per curiam*).

As is the case for claims of false arrest, "[t]he existence of probable cause will likewise defeat a claim for malicious prosecution. . . ." *Id.* at 259–96 (quoting *Gabrou,* 462 A.2d at 1104). In the context of a malicious prosecution claim, "probable cause is defined as the existence of facts and circumstances as will warrant a cautious man in the belief that his action and the means taken in prosecuting it are legally just and proper." *Pitt*, 491 F.3d at 501–02 (internal quotation marks omitted). Further, although the probable cause determinations for false arrest and malicious prosecution are substantively the same, the point in time at which an officer must have probable cause differs: probable cause to arrest focuses on "whether there was probable cause for the *initial* arrest," whereas probable cause to initiate a proceeding against an individual focuses on "whether there was probable cause for the '*underlying suit*.' " *Pitt v. District of Columbia*, 491 F.3d 494, 502 (D.C. Cir. 2007) (emphasis added) (quoting *Joeckel v. Disabled Am. Veterans,* 793 A.2d 1279, 1282 (D.C. 2002)).

Here, Plaintiff was criminally charged with unlawful entry on property, disorderly conduct, threats to do bodily harm, and assault on a police officer. Ex. J to Defs.' Reply (Dkt. No. 24-1); Ex. G to Defs.' Mot. Summ. J. Defendants make two points in asserting their defense to Plaintiff's malicious prosecution claim: (1) They had probable cause to bring charges against Plaintiff, Defs.' Mot. Summ. J. at 4; and (2) even if they lacked probable cause, Officer Williams argues separately that she is not liable because she was not involved in bringing charges against Plaintiff, *id.* at 6. Because Defendants have not challenged whether Plaintiff can satisfy the other elements of a malicious prosecution claim, *see* Defs.' Mot. Summ. J. at 6–7; Defs.' Reply at 2–4, the Court will treat the unaddressed elements as conceded. *See, e.g.*, *Texas v. United States*, 2014 WL 2758597, at *7 (D.D.C. June 18, 2014).

Before turning to the merits of these arguments, the Court notes that Defendants first argument misstates the law. Defs.' Mot. Summ. J. at 4. ("[T]he existence of probable cause [to arrest Plaintiff] also defeats Plaintiff's claim of malicious prosecution."). There must be probable cause to bring *each* charge against Plaintiff; probable cause for one charge does not serve as a valid defense for the other charges. 52 AM. JUR. 2d § 52, at 235 (2011) ("One reasonable ground for an action will not excuse others that are without probable cause."). The Court now turns to whether there is a genuine issue of material fact that there was probable cause for each charge against Plaintiff.

### i. Unlawful Entry onto Property

The probable cause inquiry is context-specific. A particular action (or inaction) may be reasonable under certain circumstances, but not others. Here, a jury could find that the applicable standard for probable cause—"the existence of 'facts and circumstances as will warrant a cautious man in the belief that his action and the means taken in prosecuting it are

legally just and proper,' " *Pitt*, 491 F.3d at 501–02 (quoting *Ammerman v. Newman*, 384 A.2d 637, 639–40 (D.C. 1978))—was not met with respect to the unlawful entry charge. Specifically, under the facts and circumstances present here, a jury could find that the officers should not have believed that bringing a charge for unlawful entry without ever checking Plaintiff's SmarTrip card was legally just and proper.

Drawing all inferences in favor of Plaintiff, the record supports the conclusion that, at some point during the incident, the officers had Plaintiff's SmarTrip card in their possession. Cousins Dep. 60:16–17, 72:4–19; Compiled Statement of Material Undisputed Facts, Responses and Replies ("Compiled Statement of Facts") (Dkt. No. 26) (Defendants admitting to Pl.'s fact ¶ 7). With Plaintiff's SmarTrip card in their possession, there was no need for the officers to rely solely on Ms. Howard's representations before referring the case to the prosecutor. As Officer Williams acknowledged, taking Plaintiff's card to a SmarTrip reader would have eliminated all the guesswork. Williams Dep. 24:15–18 ("[The SmarTrip reader] can actually tell you the date, the time, the location, the last time [Plaintiff] used it, and at—to enter or exist a station, to get on or off a bus; it could tell you a whole lot of different information."). Indeed, Officer Williams stated that this was the "first thing" that should be done. Williams Dep. 24:8–12 ("[I]f someone is accused of not paying their fare, the first thing we need to do is see their fare media, whether it be a paper card or a SmarTrip card, and that's what we were asking for."). And any of D.C.'s many metro stations—including nearby L'Enfant Plaza—would have sufficed. Williams Dep. 24:19–22 ("Q: And where would a SmarTrip reader be in relation to where you arrested Mr. Cousins?"; "A: It could—in the station, you could check it at a kiosk, or you can check it at an actual fare machine."); Williams Dep. 24:25, 25:1 ("Q: But you could [check his SmarTrip card] at L'Enfant Plaza?"; "A: Yes."). Thus, the burden, if any, on the officers in checking Plaintiff's

SmarTrip before charging him with unlawful entry was minimal; the upside, however, was unquestionable—it would for all intents and purposes conclusively exculpate or inculpate Plaintiff. Under the circumstances, then, the Court believes checking the SmarTrip card was a reasonable precaution for the officers to take before charging Plaintiff with unlawful entry onto property. Having failed to do so, taking the facts in the light most favorable to the plaintiff, as required, the Court concludes that a jury could find that the officers lacked probable cause to bring this charge.[11]

This disposes of Defendants' lone argument that they are not liable for the malicious prosecution claim because they had probable cause to arrest. Defs.' Mot. Summ. J. at 4. Nevertheless, although this argument was not raised by Defendants, the Court pauses to note that Defendants could not have found shelter in the line of cases, discussed *infra* Section III.B, holding that officers generally do not have to explore an individual's claim of innocence after concluding that there's probable cause to arrest. *See, e.g.*, *Amobi*, 2014 WL 2895933, at \*5 (collecting cases). These cases are not controlling because they concern probable cause to *arrest* an individual, *id.*, which requires courts to look at the officer's knowledge just prior to the arrest. Probable cause to bring charges, on the other hand, focuses on the information available to the officers prior to bringing the charge. *Pitt*, 491 F.3d at 502. This difference in timing is significant. As discussed above, the exigencies of an arrest often will require officers to respond

---

[11] Even more inexplicable, the record indicates that the officers and prosecuting attorneys pursued the unlawful entry charge for *several months* without checking his SmarTrip card. It was not until a scheduling conference on June 13, 2011—several months after charges were brought on January 15, 2011—that the officers and prosecuting attorneys promised to produce the SmarTrip card in D.C. Superior Court, and Judge Mize warned them at the scheduling conference to "produce the Metro card or the Court will dismiss" the three remaining charges (unlawful entry onto property, threats against a police officer, and assault against a police officer). Scheduling Conf. Tr. at p.7, *United States v. Cousins*, No. CMD-892-11 (D.C. Sup. Ct. June 13, 2011) ("Scheduling Conf. Tr.") (Ex. 1 to Pl.'s Opp'n). Officer Hathaway conceded that they waited until June 13, 2011 to check Plaintiff's card. Compiled Statement of Facts (Defendants admitting to Pl.'s fact ¶ 11); Hathaway Dep. 34:5–22 (responding to the question "[w]hen did you try to get the information off of the [SmarTrip] card" by stating "[o]n the way over to court, after signing the card out," and further clarifying that it was "probably" June 13th). This nonchalant disposition towards Plaintiff's rights is troubling.

promptly to potentially volatile situations. Requiring officers to investigate claims of innocence after developing probable cause may unnecessarily intrude on an officer's ability to do so. When an individual has already been arrested and detained, in contrast, the exigencies are often less weighty. On the other end of the scale, the benefit of taking an additional precaution after the individual has been arrested but before bringing charges can be consequential. This is especially the case where the additional precaution can be taken swiftly and with little, if any, burden on the officers, while at the same time providing compelling evidence of guilt or innocence. The facts here epitomize this scenario.

In sum, the Court thus denies Defendants' motion for summary judgment on Plaintiff's claim of malicious prosecution based on the unlawful entry charge.

### ii. Disorderly Conduct

In asserting that they had probable cause to charge Plaintiff with disorderly conduct, Defendants relied on the same facts that provided them with probable cause to arrest him for disorderly conduct. Defs.' Mot. Summ. J. at 4 (stating that "Plaintiff Cousins admits that he and the bus operator 'had words' over her allegation to him that he had walked to the back of the bus without paying his fare," and "that the bus operator told the arresting officer that Mr. Cousins had not paid and had refused to exit the bus"). Defendants contend that the "record is silent as to any reason why the arresting officer should disbelieve the bus operator." *Id.* The Court agrees. As discussed above, *supra* Section III.B., the information Ms. Howard provided to the officers was sufficient to form probable cause to arrest Plaintiff for disorderly conduct. This information also provided the officers with probable cause to charge him with disorderly conduct.

### iii. Threats Against a Police Officer

Defendants' motion for summary judgment does not specify which facts support the threat charge, but the Information filed by the prosecuting attorney and Officer Hathaway's police report highlight the underlying facts. The Information states that "Covey Cousins made threats to do bodily harm to Officer David Hathaway and his family." Ex. J to Defs.' Reply (Dkt. No. 24-1). Similarly, the last sentence of David Hathaway's police report states: "The Defendant continued throughout the whole time at the hospital to state if the undersigned officer was ever in plain clothes with his family around the Smithsonian Metro Station, 'he would fuck him up.' " Ex. C to Defs.' Mot. Summ. J. (Dkt. No. 19-1). Plaintiff denies that he made any threats to the officers at the hospital. Plaintiff also states—and Officer Hathaway concedes—that Officer Hathaway did not include this final sentence in his original police report, but later added this sentence allegedly at the request of the prosecuting attorney.[12] *See* Compiled Statement of Facts ¶ 24; Cousins Dep. 79:10–12 (Ex. 7 to Pl.'s Opp'n).

The Court finds that there is a genuine issue as to whether Plaintiff threatened Officer Hathaway and his family. The Court reaches this conclusion because the basis for probable cause to arrest Plaintiff for assault is Officer Hathaway's *own*, disputed account of Plaintiff's conduct. This is unlike the officers' basis for probable cause to charge Plaintiff with disorderly conduct, which was based on Ms. Howard's (a *third party's*) representations, and the officers did not have any reason to believe Ms. Howard's representations were untrustworthy.

In sum, it is for a jury to decide whether Officer Hathaway's or Plaintiff's conflicting accounts of the facts is more credible. *See, e.g.*, *Dormu*, 795 F. Supp. 2d 7, 21 (D.D.C. 2011) (recounting the officers' and plaintiff's competing version of their encounter, and, viewing the evidence in the light most favorable to the plaintiff, concluding that "no reasonable officer could

---

[12] The final sentence appears to have been written in pencil, whereas as the rest of the report appears to be in typed font. Ex. C to Defs.' Mot. Summ. J. (Dkt. No. 19-1).

believe that probable cause existed" to arrest); *see also Jocks v. Tavernier*, 316 F.3d 128, 135 (2d. Cir. 2003) ("On [the plaintiff's] version of the facts . . . a jury could . . . find that the arrest lacked probable cause."); *see generally Nichols v. Woodward & Lothrop, Inc.*, 322 A.2d 283, 285 n.1 (D.C. 1974) ("Where the facts are in dispute, the issue of probable cause . . . is for the jury."). The Court therefore denies Defendants' motion for summary judgment as to Plaintiff's malicious prosecution claim based on the threat charge.

### iv. Assaulting, Resisting or Interfering with a Police Officer

As is the case with the threat charge, the facts providing probable cause to bring a charge for assaulting, resisting or interfering with a police officer consists solely of Officer Hathaway's disputed account of his interactions with Plaintiff. Plaintiff contends that he did not resist arrest or assault either officer. Cousins Dep. 71:4–22, 77:2–13, 79:13–16. Accordingly, the Court denies Defendants' motion for summary judgment as to Plaintiff's malicious prosecution claim based on assaulting, resisting or interfering with a police officer charge.

### v. Officer Williams — Malicious Prosecution

Finally, Defendants contend that even if the Court concludes that they lacked probable cause to defeat Plaintiff's malicious prosecution claim, Officer Williams is entitled to summary judgment on this claim because she did not have any involvement in bringing charges against Plaintiff. Defs.' Mot. Summ. J. at 6 ("Officer Hathaway, along with the US Attorney's Office instituted criminal proceedings against Plaintiff and not Defendant Williams."). Defendants rely on *Pitt*, 491 F.3d at 505, in support of their argument. Their argument is unpersuasive.

Officer Williams testified in the July 21, 2011 hearing in D.C. Superior Court on the charges brought against Plaintiff. *See* Ex. I to Defs.' Reply (Dkt. No. 24-1). She was thus involved and facilitated the prosecution against Plaintiff. Her involvement in the proceedings

against Plaintiff exposes her to liability on the malicious prosecution claim to the same extent as Officer Hathaway. *Amobi*, 2014 WL 2895933, at *8 (" '[A]ppearing in court and testifying and keeping the prosecution alive' creates a genuine issue of dispute as to whether a defendant continued a malicious prosecution." (quoting *Viner v. Friedman,* 33 A.2d 631, 632 (D.C. 1943))); 52 AM. JUR. 2d § 21, at 208 ("A person who had no part in the commencement of the action, but who participated in it at a later time, may be held liable for malicious prosecution.").

### D. Defamation

A cause of action for defamation has four elements: "(1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm." *Oparaugo v. Watts*, 884 A.2d 63, 76 (D.C. 2005) (citation and internal quotation marks omitted). Defamatory statements made under a qualified privilege are not actionable, however, unless the plaintiff shows that there was excessive publication or express malice. *See Jackson*, 541 F. Supp. 2d at 344 (citing *Smith v. District of Columbia*, 399 A.2d 213, 221 (1979)). To qualify for the privilege, "the communication must be made in good faith upon a subject matter in which the party communicating or the party receiving the communication has a legitimate interest." *Id.* (citing *Smith*, 399 A.2d at 221).

Plaintiff avers generally that the statements "in the warrant instituted by Defendants, and subsequent false testimony, were defamatory statements." Pl.'s Compl. ¶ 29. Other than these general suppositions, however, Plaintiff has not directed the Court's attention to any specific statements that Plaintiff contends are defamatory. In opposing summary judgment, Plaintiff has

an obligation to come forward with specific evidence establishing a genuine dispute of material fact, and this sort of conclusory briefing falls short of this obligation. *See Ben-Kotel v. Howard University*, 319 F.3d 532, 536 (D.C. Cir. 2003). Nor has the Plaintiff attempted to show that there was excessive publication or express malice. Accordingly, the Court grants summary judgment to Defendants on the defamation claim.

### E. Defendants' Motion *in Limine*

Defendants filed a motion *in limine* to exclude as hearsay Judge Mize's findings of facts from the related proceedings in D.C. Superior Court. Defs.' Mot. in Limine (Dkt. No. 25). This motion was premature, and thus the Court denies it without prejudice. The typical course of action is for parties to file—and the court to rule on—motions *in limine* after the court rules on motions for summary judgment, usually for the obvious reason that the resolution of the motion for summary judgment may dispose of the entire case, thus making trial unnecessary. Although the Court's opinion does not dispose of the entire case, dismissing the motion without prejudice will provide Defendants the opportunity to reformulate their motion in light of this ruling, if they so choose. To the extent that Defendants sought to exclude Judge Mize's factual findings from consideration on the motion for summary judgment, the motion *in limine* is denied as moot because the Court had no need to consider those findings in ruling on summary judgment.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**. The Court denies summary judgment to Defendant Hathaway on Plaintiff's assault and battery claim; it grants summary judgment to Defendant Williams on Plaintiff's assault and battery claim; it grants summary judgment to both Defendants on Plaintiff's false arrest claim; it denies summary judgment to both Defendants on Plaintiff's malicious prosecution claim based on unlawful entry onto property, threats against a police

officer, and assaulting, resisting or interfering with a police officer; it grants summary judgment to both Defendants on the malicious prosecution claim based on disorderly conduct; and it grants summary judgment to both Defendants on the defamation claim.

SO ORDERED.

Date: August 15, 2014

_____
ROBERT L. WILKINS
United States Circuit Judge
(Sitting by designation in the United States
District Court for the District of Columbia)